## JAMES W. MATTINGLY ET AL. v. CHARLOTTE HALL SCHOOL ET AL.

[No. 1272, September Term, 1976.]

*Per Curiam Order May 24, 1977.*

*Opinion Filed September 7, 1977.*

## PER CURIAM ORDER

The Court having considered the Bill of Complaint and the Demurrers thereto, filed in the Circuit Court for St. Mary's County, and the order entered in that court sustaining the Demurrers to the Bill of Complaint, without leave to amend; and having considered the briefs and the arguments of counsel in this Court on appeal; it is this 23rd day of May, 1977, by the Court of Special Appeals of Maryland,

ORDERED that the judgment of the Circuit Court for St. Mary's County be and it is hereby affirmed.

An opinion of this Court will be hereafter filed.

The cause was argued before POWERS, DAVIDSON and MELVIN, JJ.

*Walter B. Dorsey,* with whom were *Dorsey & Rue* on the brief, for appellants.

*Joseph Ernest Bell, II,* with whom was *Thomas C. Hayden, Jr.,* on the brief, for appellees.

POWERS, J., delivered the opinion of the Court.

By an order entered on the day this appeal was argued we affirmed the judgment of the Circuit Court for St. Mary's County, and stated that an opinion of this Court would be thereafter filed. Our opinion follows.

On or about 15 July 1976 The Board of County Commissioners of St. Mary's County, Maryland, and Charlotte Hall School, a body corporate, entered into a written agreement which was entitled, "Option To Purchase Real Estate". The effect of the agreement was that the County took an option, for approximately one year, to buy

> "All land and real estate of the Seller, known generally as Charlotte Hall School Property, estimated to contain between 260 and 300 acres, more or less, including all buildings and appurtenances."

Certain personal property of the School was included, and some was excluded.

It was recited that

> "This Option is given in order to enable Buyer sufficient time to explore proposed and possible public uses of the property and to determine the method of financing same should Buyer exercise its option."

The price was to be an amount sufficient to pay two existing encumbrances, approximately $1,150,000.00.

As consideration for the option the County agreed to pay interest on the encumbrances for one year, to pay premiums

on insurance policies, and to maintain the property and buildings in a caretaker capacity. It was agreed that if the County did not exercise the option the School would give the County a junior mortgage for the net amount of its outlay in fulfilling its obligations under the agreement.

There were numerous other provisions in the agreement, among them an intangible whose historic significance we cannot ignore. The agreement said:

> "The parties acknowledge that the option period reflects a time of great transition, a time immediately following the closing of Charlotte Hall School, a school of 202 years of continued existence. In this respect, the Buyer agrees to cooperate with Seller so as to facilitate, at Seller's expense, the cataloguing of memorabilia, trophies, souvenirs and other items intrinsic and peculiar to the school, * * *. * * * Seller reserves right to place an appropriate memorial on the premises at a site to be agreed upon by the parties, the memorial intended to give notice of the school's long and distinguished history." [1]

---

1. Charlotte Hall School came into being as the jointly operated Free-School of three Southern Maryland counties. The term "Free-School" connoted that the institution provided a liberal arts education, not that the education was free of cost, although the early Free Schools received a degree of tax support. We record a little of the background to the founding of Charlotte Hall School. An Act of the General Assembly in 1696 contemplated the establishment of a Free School in every county. It provided that the first, to be called King William's School, (later to become St. John's College) be founded at a place called "Ann-Arundel Town, upon Severn River". The second was to be at the Town of Oxford, in Talbot County, with others to follow in every county. In 1723 the General Assembly passed "An Act for the Encouragement of Learning, and erecting Schools in the several Counties within this Province." It required the erection of one school near the center of each county, and named a board of seven visitors for each county.

Many of the county Free Schools encountered difficulties, and in 1774 the General Assembly, reciting representations to it by "sundry the Inhabitants of Saint Mary's, Charles, and Prince-George's Counties that the Free-Schools in the said Counties do not separately afford sufficient Encouragement for proper Masters", enacted

"That as soon as may be, after the End of this present Session of Assembly, there shall be erected one School for the said Counties of Saint Mary's, Charles, and Prince-George's, at the Place aforesaid, called the Cool Springs, in Saint Mary's County, which shall be called by the Name of *Charlotte-Hall*."

Promptly after the option agreement was entered into, James W. Mattingly and five other individuals, as residents and taxpayers of St. Mary's County, filed a Bill of Complaint against Charlotte Hall School and the members of the Board of County Commissioners, seeking to rescind the agreement and to enjoin the expenditure of public funds pursuant to its terms.

Both the School and the County Commissioners demurred to the complaint. The demurrers were submitted to the court, Robert J. Woods, Judge, who thereafter sustained the demurrers without leave to amend. This ruling constituted a final judgment. Maryland Rule 373 d., from which the plaintiffs appealed.

The only issue, below and here, is whether the Board of County Commissioners had the authority to enter into the option agreement. The authority, if it existed, must be found in Code, Art. 25, § 11A, which reads, in part:

> "The county commissioners of every county in the State may acquire by purchase, gift, devise, bequest, condemnation, or otherwise, any property, or any interest therein, of any kind needed for any public purpose * * *."

And since the statute does not spell out separately the authority to take an option, we must decide whether the grant of express authority to purchase property needed for any public purpose includes, by implication, the power to take an option on property before deciding whether to purchase it.

The decisions dealing with the question are uniform in stating the principles which control. In *Rushe v. Hyattsville*, 116 Md. 122, 81 A. 278 (1911) the Court of Appeals said, at 126:

> "It is settled by all of the authorities that municipal corporations have only such powers as

The Act also provided for a board of 21 Trustees, seven from each of the three counties.

By an Act passed in 1798 Calvert County was authorized to participate with the other three counties in the operation of Charlotte Hall School. The number of Trustees was enlarged to 28.

are granted to them by the constitution or statutes, either expressly, or by fair and reasonable construction.

"The following statement from 1 *Dillon on Munic. Corp.*, 4th Ed., sec. 89, is supported by practically an unbroken line of decisions: 'It is a general and undisputed proposition of law that *a municipal corporation possesses and can exercise the following powers and no others*:

"First. Those granted in express words; second, *those necessarily or fairly implied* in or incident to the powers expressly granted; third, those *essential* to the declared objects and purposes of the corporation — *not simply convenient, but indispensable.*' See also cases of *St. Mary's Industrial School v. Brown*, 45 Md. 331; *Baltimore City v. Bond*, 104 Md. 590; *Revell v. Annapolis*, 81 Md. 9; *Minturn v. Larue*, 23 How. 436.

"It is equally well settled that any fair and reasonable doubt as to the existence of the power attempted to be exercised must be resolved against the corporation, and in such case the power must be denied."

The Court of Appeals, in *Howard County v. Matthews*, 146 Md. 553, 127 A. 118 (1924), had before it the validity of a contract made by Howard County to complete the construction or improvement of a road, after default by the first contractor. The second contract had been made without advertisement and award to the lowest responsible bidder. The Court set out "the settled law of this State." It said, at 561:

"Counties, like municipal corporations, can only exercise such powers as are expressly granted by the State, together with such implied powers as are necessary for the execution of the powers expressly granted. Officers of a county are public agents of limited powers, and cannot bind the public by their acts in excess of the delegated power, nor can an

expressly delegated power be exercised in a manner contrary to the mandatory language of the enabling statute."

The Court ruled on this aspect of the case, saying, at 564:

"It will therefore be seen that the express power given in the statute to construct a road carried with it the necessarily implied power to complete the construction or improvement in case of default by the original contractor, and that it was unnecessary to readvertise for the completion of the construction or to require a new bond of the contractor who was to complete the road, after assent had been given by the surety on the original contractor's bond."

In a brief reference to the question in *Duvall v. Lacy*, 195 Md. 138, 73 A. 2d 26 (1950), the Court said, at 143:

"Municipal corporations have only the powers conferred upon them by the Legislature, and these are to be strictly construed. 'To doubt such power in a given case is to deny its existence.' *Hanlon v. Levin*, 168 Md. 674, 179 A. 286, 287, *Mayor & City Council of City of Baltimore v. Canton Company*, 186 Md. 618, 631, 47 A. 2d 775."

See also *Barnett v. Charles County*, 206 Md. 478, 112 A. 2d 492 (1955), which involved the wrong choice by the County between a special procedure and general procedures for condemnation of land. The Court noted, at 483:

"It has been generally held that powers granted to county commissioners should be strictly construed, for they confer a special and limited jurisdiction."

Within the framework of the governing principles of law, we have no difficulty in holding that in the circumstances of this case, the express power to purchase the property, if needed for a public purpose, carried with it the implied power to enter into an option, to assure the availability of

the property until the county could determine whether it was needed for a public purpose.

It is plain common sense that the determination of whether a particular piece of property is needed for a public purpose calls for the exercise of judgment by those officials to whom that decision is committed. When we entrust to a public official the power to exercise his judgment on a question of public business, we also charge him with the duty to exercise an intelligent, well informed, and well considered judgment.

An anomaly of this case is that if the Board of Commissioners had made a snap judgment that the Charlotte Hall property was needed by the county, and had entered into a binding contract to buy it, the appellants would not be here. They would not have been in the circuit court. They would have recognized that no matter how much they may disagree with the judgment of the Board of Commissioners, the Board had the power to determine the need, and the power to purchase the property.

Strangely enough, the complaint of the appellants is that the Board of Commissioners entered into the option agreement without having determined that the property was needed for a public purpose.

What the appellants condemn as illegal, we commend as cautious and prudent.

A sound decision to buy or not to buy may require consideration of many factors. The greater the magnitude of the transaction, the greater the need that the decision be a well informed one. To become well informed costs money. What cost is justified in relation to the proposed transaction is a matter of judgment, not a matter of authority.

No one would question the cost of an appraisal, incurred to aid the members of the Board in deciding whether to purchase the property. Buying time is no different from buying information. Both are necessary to the exercise of

well informed and well considered judgment. The option bought time.

Whether incurring the cost of the option was good judgment or bad is not the issue. Only the authority to incur that cost is at issue. That authority was a necessary incident to the exercise of the authority to purchase the property.

The demurrer to the bill of complaint was properly sustained, without leave to amend.