## MAYOR AND CITY COUNCIL OF BALTIMORE *v.* CHARLES CENTER PARKING, INC.

[No. 113, September Term, 1970.]

*Decided November 13, 1970.*

The cause was argued before HAMMOND, C. J., and MC-WILLIAMS, FINAN, SMITH and DIGGES, JJ.

*Simon Schonfield, Assistant City Solicitor,* with whom was *George L. Russell, Jr., City Solicitor,* on the brief, for appellant.

*Jonathan A. Azrael,* with whom were *Azrael & Gann* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

Within the decade just past the block in downtown Baltimore bounded by Baltimore Street, Lombard Street, Charles Street and Hopkins Place has undergone an almost incredible transformation, not the least facet of which is the vast masonry cavern which lies beneath its surface and in which as many as 800 motor vehicles can be parked. Its owner, the appellee (Parking), calls the business it carries on therein the "Down Under Parking Garage." As one might expect, the movement of traffic in this area has some relevance. Vehicles are allowed to move south on Hopkins Place; they may not cross Lombard and since Lombard accommodates eastbound traffic only, all traffic must turn east on Lombard. Hanover Street, since about 1967, is for southbound traffic only. The main entrance of the garage, on Lombard, looks directly down Hanover and Parking finds provoking the fact that Hanover is now available only to motorists moving *away* from its garage whereas before 1967 it brought northbound traffic to its entrance. It is also upset because motorists southbound on Hopkins Place, who must turn left on Lombard, quite often go past the entrance before realizing it is the entrance. To abate this undesirable situation Parking rented space on the brick wall of a nearby building belonging to Hertz Corporation on which it proposed to paint a sign (90 feet by 15 feet) visible to motorists southbound on Hopkins Place. The sign, painted after the decision of the trial

judge, Joseph L. Carter, J., tells motorists they can "PARK DOWN UNDER — KEEP IN LEFT LANE." To emphasize the "down under" aspect of the garage there is also a black line drawing of an ebullient maternal kangaroo, peeping from whose marsupial pouch is a brash, precocious looking junior kangaroo. Within a large arrow, pointing east, are the words "ONE BLOCK." The application for a permit to paint the sign, filed with the Bureau of Building Inspection in May 1967, was denied. A second application, filed 11 December 1967, was also denied.

The denial in both instances was based on Section 1 (e) (4) of Baltimore City Ordinance No. 663, approved 1 November 1965 (now Baltimore City Code (1966 ed.), Art. 1, Sec. 39 (e) (4)) which provides generally for the regulation of "commercial signs, billboards, and other advertising structures and devices" within a specifically delineated area of downtown Baltimore. It also created a "Commission on Signs" to administer the ordinance and such rules and regulations as might be promulgated by the Commission. Specifically, Section 1 (e) provides that:

> "It shall be unlawful, within the area described [which includes the Hertz building] * * * (4) for any commercial sign, billboard, or other advertising structure or device *to be painted on any exterior wall of a building* except as a substitute for a sign on the primary facade of said building." (Emphasis added.)

In respect of billboards and posterboards the ordinance provides as follows:

> "(i) Nothing in this ordinance shall be construed to apply to any billboard or posterboard with respect to which the Board of Municipal and Zoning Appeals has original jurisdiction under Section 37 of the Baltimore City Zoning Ordinance.
>
> "The Board of Municipal and Zoning Appeals

shall submit drawings, plans, painted bulletins and specifications and any other data concerning the application for such a billboard or posterboard within the area covered by this ordinance to the Commission on Signs for investigation, recommendation and report."

Parking filed suit against the Mayor and City Council of Baltimore in the Circuit Court of Baltimore City seeking a declaration that Ordinance 663 is "invalid, unconstitutional and null and void," and to enjoin the City from enforcing the ordinance. Judge Carter elected to consider only one of the several issues raised by the parties. He noted that the section in question prohibited painted signs in an area where billboards and posterboards were clearly allowed (subject to zoning regulations), and he concluded "that there is absolutely no reasonable basis for this distinction * * *." Thus Section 1 (e) (4) was held invalid as being "so arbitrary and discriminatory as to exceed the bounds of governmental regulation permitted by Article 23 of the Declaration of Rights of the Maryland Constitution and the Fourteenth Amendment to the Constitution of the United States." We agree.

The City argues that Parking has failed to overcome the presumption in favor of the validity of legislative enactments. That such a presumption exists is clear. *Gino's v. Mayor and C.C. of Baltimore*, 250 Md. 621 (1968); *A & H Transp. Inc. v. Mayor and C.C. of Baltimore*, 249 Md. 518 (1968); *Pitts v. State Board of Examiners of Psychologists*, 222 Md. 224 (1960); *McBriety v. Mayor and C.C. of Baltimore*, 219 Md. 223 (1958). But we think the testimony produced by Parking and the absence of any showing by the City that the ordinance was not arbitrary or unreasonable in its classification suggest that the presumption has been overcome. In any event, we seem unable to conceive of the existence of any state of facts which would sustain such a classification. *Gino's, supra* at 637.

Bernard Willemain's expertise in the field of planning and land use was conceded by the City but, at trial, his qualifications to give expert testimony in respect of the facts of this case were challenged. Judge Carter allowed him to testify and his ruling in this regard is not an issue here. Willemain testified, in part, as follows:

"* * * The thing I find most striking, your Honor, is that this specific prohibition in this ordinance, which is the reason why this case is before you today, doesn't prevent or modify the esthetics of the signs that could be put on the same billboards in the same location. The only difference is this matter of construction and procedure to be followed."

* * *

"Q. (By Mr. Azrael) What is your opinion on the distinction in this ordinance which is based solely on the material which is used to construct the sign?"

* * *

"A. Certainly if there is any justification for esthetic control alone, then this is not taken care of with this ordinance which would permit a billboard or posterboard, but not the painting directly on the wall, which is a mechanical consideration, not one of affording esthetics. In fact, it is my opinion that the painting in this particular case would be more esthetic than erecting a billboard because the steel structure would not be exposed that has to be shown with a billboard."

Willemain's testimony does constitute evidence challenging the validity of singling out painted signs for regulation. The City, as we have said, failed to produce testimony that the distinction between painted signs and billboards was rational in this context.

The City argues that since we have recognized the distinction we should not now deny that it exists. It cites

*Grant v. Mayor and C.C. of Baltimore,* 212 Md. 301 (1957), and *Grebow v. Mayor and C.C. of Baltimore,* 217 Md. 333 (1958), in support of its argument. In *Grant,* upholding the constitutionality of a statute providing for the removal, over a five year span, of all billboards and posterboards in certain residential areas of the City, we observed that the preamble to the ordinance contained the legislative finding that the blighted appearance and depreciated values created by the billboards did so affront the health, comfort, and general welfare of the residential community as to outweigh the resulting harm to the individual sign owners. In *Grebow,* painted signs were specifically excluded from the removal provisions of the ordinance discussed in *Grant.* We are not impressed by this argument. We think the City's reliance on *Grant* and *Grebow* is misplaced for two reasons. First, *Grebow* held merely that a painted sign is not a "billboard" or "posterboard" under the particular ordinance. They were not one and the same in 1958 and no one claims that they are today. *Grebow* presented a bare definitional problem. Second, it is clear from these two cases that, on proper legislative findings, we have sanctioned the regulation of billboards and posterboards. Ordinance 663 excludes them from regulation and at the same time places very strict regulations on painted signs. The records in *Grant* and *Grebow* justified the distinction between painted signs and billboards when the latter were being regulated, and we agreed that billboards required stricter regulation. The record in this case offers no justification for regulating painted signs. In light of *Grant, Grebow,* and the record before us, the fact that painted advertising signs are regulated more strictly than billboards containing the same advertising material can hardly be justified.[1]

---

1. The City insists there is no evidence that the same advertisement could appear on a billboard. We must assume, as did Judge Carter, that a billboard which passes the tests set out in Baltimore City Code (1966 ed.), Article 30, Section 44. (Zoning Ordinance) could be erected. The City's contention that Parking must *prove* such a billboard would be allowed is without merit. The fact is that a billboard which does not offend the "public health, safety,

The City cites but one case in support of its position. In *General Outdoor Advertising Co. v. Department of Public Works,* 193 N. E. 799 (Mass. 1935), a comprehensive set of ordinances regulating outdoor advertising in the historic town of Concord was challenged by local advertisers. Included was a prohibition against painted signs within 50 feet of roadways and on the walls of buildings. The court said the regulation was not arbitrary. Painted signs could not be removed, it said, they became permanently affixed to the property and were therefore beyond public control. Oddly enough the statute specifically provided that "objectionable matter may be required to be removed." The uncontradicted testimony in the instant case is that it is quite easy to remove painted signs:

> "Q. (By Mr. Azrael) Could a painted sign be removed more easily than a billboard?
> "A. Yes, sir."

We decline to adopt the view of the Massachusetts court since its premise seems to be incorrect or else its conclusion is inapposite.

We have not been shown nor have we found any other cases dealing with a statute similar to Ordinance 663, but there are a few which present analogous situations. The Supreme Court of Florida has held invalid a statute making a similarly arbitrary distinction:

> "Bearing in mind that aesthetics is the criterion by which the merits of the ordinance should be judged, we find insurmountable difficulty to a decision that a wall sign 300 square feet in size at non-point of sale would not offend while a sign of the same size on one of petitioner's billboards would, or that an unrestricted wall sign, at point of sale, would be inoffensive but one of petitioner's signs would shock refined senses,

---

security or morals" has a good chance of being approved under the Zoning Ordinance. A painted sign, equally inoffensive, has no chance at all under Ordinance 663.

or for that matter that a roof, ground, or other sign could be only 180 square feet while a wall sign could be 300 square feet and, if at point of sale, unlimited." *Sunad, Inc. v. City of Sarasota*, 122 So. 2d 611, 614-15 (Fla. 1960).[2]

In *City of Santa Barbara v. Modern Neon Sign Co.*, 11 Cal. Rptr. 57 (Cal. App. 1961), an ordinance which prohibited moving signs but allowed flashing signs was held invalid. We find persuasiveness in that court's observation that "[t]here is no natural, intrinsic, or constitutional distinction which furnishes a reason for or justifies the classification of moving and flashing signs in the manner found in the sign ordinance in question." *Id.* at 59. *See also Abdo v. City of Daytona Beach*, 147 So. 2d 598 (Fla. App. 1962); *Eskind v. City of Vero Beach*, 159 So. 2d 209 (Fla. 1963); *Peltz v. City of South Euclid*, 11 OhioSt.2d 128, 228 N.E.2d 320 (1967).

We have not found in this record any sound rationale for distinguishing between painted signs and billboards in the designated area of Baltimore. Accordingly, Section 1 (e) (4) of Ordinance 663, which purports to regulate painted signs to the point of exclusion but which fails to regulate billboards with the same advertising content, must be considered arbitrary and unreasonable. We offer no comment on the constitutionality of the entire ordinance. We hold only that Section 1 (e) (4) is null and void. *Clark's Brooklyn Park, Inc. v. Hranicka*, 246 Md. 178, 185-86 (1967).

In view of our holding we have concluded, as did Judge Carter, that it is unnecessary for us to consider any of the other matters raised by the parties.

> *Decree affirmed.*
> *Costs to be paid by the appellant.*

---

2. Our decision here does not require us to reach the question whether aesthetic considerations alone are sufficient justification for the regulation of outdoor advertising despite Florida's determination that aesthetic values may be a primary consideration, particularly in its resort cities.